### THE STATE BANK v. HAMILTON and Another.

Where representations of character, &c., are made which are false, and are fraudulently made with the intention to deceive and defraud the person to whom they are made, and he thereby suffers, the party making such representations will be liable.

But if the party making such representations, at the time they were made, had some information as to the matters stated, and from the information he had received, he believed such statements to be true, and they were made without any fraudulent intention to deceive the plaintiff, he will not be entitled to a verdict.

ERROR to the *Marion* Circuit Court.

SMITH, J.—This was an action on the case brought by the plaintiff in error against the defendants in error. The declaration contains eight counts. The first count alleges that on, &c., the defendants, fraudulently intending to deceive the plaintiff, and to induce the plaintiff to purchase the bills of exchange therein mentioned, addressed to *Bethuel F. Morris*, who was then cashier of the branch of the plaintiff at *Indianapolis*, a letter recommending the firm of *McQueen* and *McKay*, of Detroit, as a house of long standing and the highest respectability, &c.; that the plaintiff, confiding in the truth of the representations contained in said letter, which was presented to the said *B. F. Morris* and the other officers and directors of the branch of the plaintiff at *Indianapolis*, purchased twelve drafts, for 1,000 dollars each, drawn by *McQueen* and *McKay* on one *James Hoyland*, at *New York*, and in consideration thereof paid the agent of *McQueen* and *McKay*, 11,872 dollars; that said drafts were not paid; and that all the representations in the said letter were false and known so to be by the defendants, where-

Monday,
May 26.

by the defendants are liable to pay said amount to the plaintiff in consequence of their false and fraudulent representations.

Some of the counts omit the averment that the defendants knew their said representations to be false, but aver a fraudulent intent to deceive the plaintiff by withholding information respecting the situation of the firm of *McQueen* and *McKay*. Other of the counts aver that the defendants had been appointed agents to purchase produce for *McQueen* and *McKay*, and that the money procured by the sale or discount of the bills was to go to the defendants for that purpose, who were to receive compensation for their services as such agents. In other respects the remaining counts are, substantially, similar to the first.

The defendants pleaded not guilty, and on the trial of this issue they obtained a verdict and judgment.

Several instructions were given by the Court to the jury, and some instructions which the plaintiff requested the Court to give were refused.

The jury were instructed that if the plaintiff purchased the drafts, relying upon the truth of the representations contained in the letter of the defendants, and those representations, as to the standing and respectability of the firm of *McQueen* and *McKay*, were false, and were made fraudulently, with *an intention to deceive and defraud* the plaintiff, and the money advanced for the drafts was lost, the plaintiff should recover the amount so advanced with interest; but if the defendants, at the time they wrote and delivered the letter, had some information as to the matters stated in it, and from the information they had received they believed their statements to be true, and the letter was written without any fraudulent intention to deceive the plaintiff, the plaintiff would not be entitled to a verdict.

The plaintiff requested the Court to instruct the jury that if the representations were false, and the defendants did not know whether they were true or false, but made them recklessly and without any well grounded reason to

believe them to be true, that would be sufficient evidence of a fraudulent intention to deceive the plaintiff. The refusal to give this instruction and others containing a similar principle, namely, that the making of such representations recklessly, without probable grounds, or without such information as would create in the minds of persons of ordinary business capacity a reasonable and sincere belief of their truth would be sufficient evidence of a fraudulent intent, is the error complained of.

The evidence, which is very voluminous, is all set out in a bill of exceptions.

It appeared that the firm of *McQueen* and *McKay* commenced business in the spring of 1842. In *February*, 1844, that firm employed one *Bushnell* to purchase produce in this state. They furnished him with drafts on *Hoyland* to the amount of 36,000 dollars, and six letters of credit, each for 6,000 dollars, signed by *Hoyland*. They also furnished *Bushnell* with a power of attorney authorizing him to transact business for them, and with letters of introduction to *Hamilton* and *Williams*, the defendants, and several other persons:

*Bushnell*, as the agent of *McQueen* and *McKay*, then proceeded to *Fort Wayne*, called upon the defendants, and presented his letter of introduction.

Mr. *Williams*, one of the defendants, introduced *Bushnell* to the cashier of the branch of the plaintiff at *Fort Wayne*, to whom *Bushnell* offered his drafts. The said cashier told *Bushnell*, in the presence of *Hamilton*, that said branch would have been glad to buy said drafts if its funds applicable to that kind of business were not already exhausted, and suggested the *Indianapolis* branch as one that would be likely to purchase. The defendants then, at *Bushnell's* request, gave him letters to various persons, and among others the letter described in the plaintiff's declaration, which was in the following words:

"*Fort Wayne, March* 6th, 1844.

"*B. F. Morris*, Esq., Cashier.

"Dear sir:—This will be handed you by Mr. *Daniel P. Bushnell*, who is introduced to us by Messrs. *McQueen* and

*McKay*, of *Detroit*, as their confidential agent. This house is of long standing and the highest respectability. Mr. *B.* has their drafts on *New York* which he wishes to use in the purchase of produce, and for which he may wish to procure *Indiana* funds; and as the branch here is not purchasing, he may visit your branch. Were we purchasing such drafts we should take them with the highest confidence of their being promptly met.

"Very respectfully,          *Hamilton* and *Williams*."

About the 17th of March, *Bushnell* arrived at *Indianapolis*, presented the letter of the defendants to Mr. *Morris*, and offered his drafts for discount. Some three days afterwards the branch of the plaintiff at *Indianapolis* discounted or purchased twelve of the drafts, which were each for 1,000 dollars, and paid *Bushnell* the proceeds, interest being deducted. At the same time that *Bushnell* presented the letter to the defendants, he also presented a letter from *Benbridge* and *Mix*, a mercantile firm at *Lafayette*, in this state, which last mentioned letter was before the directors of the *Indianapolis* branch when they determined to purchase the drafts in question. It appeared, however, that the officers of the plaintiff were induced to purchase the drafts by the representations in the letter of the defendants as to the character of the house of *McQueen* and *McKay*, the defendants being well and very favorably known to them.

*Hoyland* accepted the drafts on their presentation to him in the city of *New York*, but before their maturity, and during the month of *April*, 1844, he absconded; and the drafts were protested for non-payment. About the same time that the drafts were protested the firm of *McQueen* and *McKay* became notoriously insolvent, and fell into universal discredit in consequence of this and other similar transactions which came to light about the same period.

At the time the defendants furnished *Bushnell* with the letter to Mr. *Morris*, *Bushnell* requested the defendants to purchase pork for him; and while *Bushnell* was at *Indianapolis* negotiating the sale of his drafts to the plaintiff, the

defendants did purchase a quantity of pork pursuant to this request. On his return from *Indianapolis, Bushnell* paid for the pork so purchased, and also paid the defendants 170 dollars as commissions for making the purchase.

Up to this point there is no conflict in the evidence, nor, except as to the proper construction to be placed upon the representations contained in the letter of the defendants, is there any controversy as to its legal effect.

The defendants admit they are liable if the representations made by them were fraudulent, or made with intent to deceive the plaintiff, but they contend that their representations were made in good faith, and that they were in fact true, the firm of *McQueen* and *McKay* having, at the time the letter was written, a general reputation as a house of good standing and high respectability.

On the other hand, the plaintiff contends the firm of *McQueen* and *McKay* did not then or ever sustain a reputation justifying the representations made in the letter of the defendants to Mr. *Morris*, and that the recklessness and want of reasonable grounds with which the representations were made, afford sufficient evidence of a fraudulent intent.

With regard to the information the defendants had previously received of the standing of the firm of *McQueen* and *McKay*, it was proved there was but little business intercourse between the towns of *Fort Wayne* and *Detroit*, and that during the year 1842, the defendants, who were manufacturing flour at *Fort Wayne*, inquired of a respectable merchant of *Detroit* the name of a suitable house in that place to act as agents for them in supplying the *Canada* market, and he recommended to them the house of *McQueen* and *McKay*. The defendants then opened a communication with the last named firm and transacted some business with them. It was also proved that during the year 1843, one *Dean* came to *Fort Wayne* as the agent of *McQueen* and *McKay*, bringing with him a considerable sum of money and letters of credit to the amount of 10,000 dollars for the purpose of purchasing pork. *Dean*

also brought a letter of introduction to the defendants from a respectable firm in the state of *Michigan.*

As respects the actual standing and reputation of the firm of *McQueen* and *McKay,* several witnesses for the plaintiff testified, that they did not consider that firm one of the highest standing and respectability, but, on the contrary, never had much confidence in it. Some of these witnesses testified that neither of the members of the firm had any capital of their own when they commenced business, but they had previously contracted debts which still remained unpaid. The previous indebtedness was not, however, generally known.

On the other hand numerous witnesses for the defendant, testified that up to the month of *April,* 1844, when the transactions which gave rise to this suit became known, the firm of *McQueen* and *McKay* was generally considered a forwarding and commission house of the first standing and respectability, and was so regarded not only at *Detroit,* but at all the commercial towns along the lakes, the *New York* and *Erie* canal, and at the city of *New York.* Their transactions in the purchase and sale of produce were very large, their notes and bills were freely discounted by various banks, and several houses well known to be of the highest respectability, were in the habit of furnishing them with drafts and letters of credit for very heavy amounts, to be employed by them in the purchase of produce for the *Canada* markets.

These are the prominent features presented by the testimony. We think there is abundant evidence that the firm of *McQueen* and *McKay* was, at the time the letter of the defendants to Mr. *Morris* was written, generally considered, at the points where they were known and had been doing business, a forwarding and commission house of high standing and respectability. At that period nothing was known calculated to militate against their credit, except some transactions which had accurred before the formation of their partnership, and these were known only to the parties concerned. It is true some in-

dividuals appear to have entertained an unfavorable opinion of them, but these opinions seem to have been based upon some personal dislike or private information, and there seems to be no reason to doubt that their general reputation was good.

The counsel for the plaintiff argue, that proof that the firm of *McQueen* and *McKay* was considered a house of high standing and respectability as *a forwarding and a commission house*, is not sufficient to sustain the defendants' representations, inasmuch as such a house may very well transact business with little or no capital, while those representations, taken in connection with the large amount of drafts offered to the plaintiff for discount, should be considered as representations that the drawers possessed means or capital to a corresponding extent.

It is true the ability of a person to meet an engagement may depend in an important degree upon the amount he contracts to pay, but it is also true that in commercial transactions it is a common practice to give credits to amounts far exceeding the known wealth or capital of the debtors. In such cases the credit given is frequently based mainly on the confidence reposed in the business capacity of the debtor to buy and sell judiciously, and in his integrity to make an honest application of the proceeds. If such confidence is well founded, the risk only extends to the losses the speculator may sustain, and which he may be unable to make up out of his own proper funds after applying the proceeds of his sales to the payment of his debt. Business houses may, therefore, and, no doubt, frequently do, enjoy almost unlimited credit in their commercial transactions though possessing but little actual capital.

The letter in question contains no representations as to the amount of capital possessed by *McQueen* and *McKay*, or as to the kind of business in which they were employed. We think it should be regarded as stating only that the firm was one of long standing and respectability, and, therefore, worthy of credit.

With regard to the responsibility of the defendants for

the truth of their statements, Chief Justice *Marshall*, in delivering the opinion of the Supreme Court of the *United States*, in the case of *Russell* v. *Clarke's* Exrs., 7 Cranch, 69, says, in such correspondence, merchants are to be presumed to speak from that knowledge only which is given by reputation, and this must be the correct rule. If the writers of such letters were responsible for the actual verity of their representations, the writing a letter of introduction or recommendation as connected with business matters would be a very dangerous thing, for every such letter would amount to little less than a guaranty.

It is evident that the letter of the defendants was not intended to guaranty the payment of the drafts in the hands of *Bushnell*, if they should be purchased by the plaintiff, and there is no reason to suppose it was so understood by the officers of the plaintiff when they purchased some of those drafts. They might have required a guaranty, or they might have required the defendants to indorse the drafts, if they desired to hold the defendants responsible in case the paper should not be met when due by *McQueen* and *McKay*. Something of this kind the plaintiff would, no doubt, have required, if unwilling to take the paper offered without holding the defendants answerable for the actual verity of their representations, and for the correctness of their opinion that the drafts would be promptly met.

Since the case of *Paley* v. *Freeman*, 3 Dumf. & E. 51, it is well established that such representations, if *fraudulently* made, would have rendered the defendants liable. But it is equally well settled by *Haycroft* v. *Cusay*, 3 East, 92, and numerous subsequent decisions, that when the person making the representations was himself deceived and had no intention to deceive others, he is not responsible for the correctness of his belief or opinions so represented, however strongly such belief or opinions may have been expressed.

We are not required to decide whether an utter recklessness in making such representations, as if the party making them should have no knowledge whatever, would

be considered sufficient evidence of a fraudulent intent if the representations turned out to be false, as no such case is made by the testimony.   Nor do we think it is necessary to decide, whether the want of such information as would be calculated to induce a well grounded belief of their truth, would be evidence to this effect, though no case has been cited, and we know of none, that would sustain a decision based upon such a proposition, when the representations were made' honestly. and in good faith.

In this case, upon a careful examination of the whole mass of evidence, we find none that has even a tendency to show that the defendants knew or believed their representations to be false; but, on the contrary, it is quite apparent, not only that they honestly believed their representations as to the standing and respectability of the firm of *McQueen* and *McKay* to be true, but that their representations, taken in the sense in which we think they should be taken, actually were substantially correct at the time their letter was written.

We think, therefore, under all the circumstances of the case, the instructions given by the Court were as favorable to the plaintiff as the latter had a right to demand, and that those refused to be given at the request of the plaintiff, might properly have been refused on the ground that they were irrelevant, without testing their correctness as abstract principles of law.

*Per Curiam.*—The judgment is affirmed with costs.

*J. Morrison, S. Major, S. Yandes,* and *H. O'Neal,* for the plaintiff.

*Z. Baird* and *O. H. Smith,* for the defendants.